# THE LAW OFFICE OF JODI MORALES

888 Grand Concourse, Suite 1H, Bronx, NY 10451. 646-242-4631
www.jlmoraleslaw.com

April 17, 2024

By Email
The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re: **United States v. Kevin Anderson**
        21 Cr. 032 (MKB)

Dear Judge Brodie:

    Kevin Anderson is scheduled to be sentenced on April 30, 2024 upon his plea of guilty to counts one through three of a three-count indictment alleging *inter alia* that on January 4, 2021, he possessed with intent to distribute one or more controlled substances, including heroin, cocaine base and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(c). For the reasons which follow, the defense respectfully requests that the Court *reject* the Probation Department's aggregate guideline range of 130 months to 147 months. The undersigned respectfully submit that this Court is not bound by the proposed guideline range and that the interests of justice, as well as Anderson's health concerns, warrant a downward departure from the guidelines. Under the circumstances, Anderson implores this Court to impose a sentence of 72 months.

    Accordingly, this submission is meant to supplement the Presentence Report (*PSR*) and provide the Court with additional information necessary to determine a sentence which is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a)(2).[1]

### Offense Conduct and Proposed Sentence

    The indictment accuses Mr. Anderson of possessing a .40 caliber semi-automatic handgun and several grams of crack cocaine, heroin, and fentanyl, which authorities recovered either from or nearby his person after engaging him on a high speed chase. Although the Government, when responding to Mr. Anderson's prior bail applications, alleged that he was involved in the shooting of Demetrius Riggins, this Court previously noted that "there is no

---

[1] The defense has several letters, which it will file under separate cover via ECF.

evidence that Mr. Anderson shot and killed anyone." Anderson denies any involvement in the shooting and defense counsel objects to paragraph 12 of the probation report wherein the shooting is mentioned. Consequently, the report's references to that uncharged shooting should not be given any weight with regard to this Court's sentencing decision. It is also worth noting that Anderson took responsibility for and admitted to each count of the indictment even though he didn't have to. He accepts the enhancement in the guidelines and admits that his conduct for the charged offenses was wrong but he should not be unfairly penalized for suspected behavior that the government chose not to charge him with.

## History and Characteristics

Kevin Anderson was born on December 30, 1982, in Brooklyn, New York to Kevin Anderson, Sr. and Anita Parker Royes. During his youth, Anderson and his brother Anthony Anderson thrived in the two parent household. Both parents were a source of emotional and financial support and consistently created happy memories for the boys. Unfortunately, as crack cocaine started to take hold of poor neighborhoods across New York City, Kevin Anderson, Sr. started using. As a consequence, his relationship with Anita suffered and the couple ultimately split.

After her separation from Kevin Anderson, Sr. she continued to do her absolute best to provide for her sons. Like most single mothers, Anita constantly juggled mounting responsibilities. She worked hard, albeit sporadically which meant that she relied on food stamps, cash assistance, and loans from family members. Although Kevin Anderson, Sr. continued to see his sons, an almost inevitable consequence of his continued drug use occurred, and he was sent to prison to serve a five year sentence for a drug related offense. Anderson, a teenager by then, should have been enjoying his father's protection and guidance, instead he spent his teen years watching his mother struggle to make ends meet. The financial stress became too much for Anita to shoulder on her own and eventually she decided to take her sons with her and moved into an apartment with other family members. Unfortunately, the new household environment was not ideal. Anderson soon found himself living with two uncles who abused crack/cocaine and an aunt who abused alcohol. While Anderson was not physically abused in the home, he suffered emotional and mental abuse by his drug and alcohol addicted family members who constantly criticized his career aspirations.

In conversations with Anderson fondly recalled wanting to be an astronaut or a lawyer. Unfortunately, his family members would often tell him he wouldn't be successful. Undeterred, Anderson saw school as a refuge where he could work on his goals. In fact, one of his earliest school memories centers around a mock trial at school. Anderson remembers feeling excited to come to class and argue his position. He asked his mother to buy him a suit, and with her meager earnings, she obliged. Anderson worked hard to impress his classmates and teachers. Sadly, when Anderson arrived at school dressed in his suit, he was met with ridicule. Not only did his classmates make fun of him, but so did his teacher. Instead of feeling supported and revered for his effort, he felt dejected and downtrodden. He began to question himself and his ability to live a productive and meaningful life. Nevertheless, he continued attending school and ultimately received his diploma from John Jay High School in 2001. Following his high school graduation, Anderson attended LaGuardia Community College from 2002-2003 where he

majored in paralegal studies. He began his college career feeling hopeful and excited about finally moving firmly in the direction of his dreams, when a terrible event derailed his plans for good.

During his second semester of college, Anderson lost a close friend. After attending his friend's funeral Anderson's vehicle was stopped by police officers. The officers mistook Anderson for a suspect and beat him badly. Following this traumatic and horrific event, Anderson fell into a deep depression and ultimately withdrew from school. As Anderson fell deeper into his depression, his school aspirations dissipated and his ability to work consistently was compromised. After years of battling his depression and working sporadically, Anderson finally saw a light at the end of the tunnel. In 2016, he worked up the courage and emotional stamina to try to better his life. That year he attended The Refrigeration Institute in Manhattan where he received vocational training to become a refrigeration technician. Anderson completed a 450 hour course and earned a refrigeration certificate which, if his medical conditions don't worsen, he hopes to put to use upon his release.

### **COVID-19 and Medical Conditions**

No one, least of all Anderson, would use his medical conditions in any way to excuse his criminal conduct. The charges are serious, and Anderson has only himself to blame for his current predicament. In fact, he has taken full responsibility for his actions by pleading guilty. However, a closer examination of Anderson's medical conditions illustrate that his prospects have been limited. In addition to being asthmatic since he was quite young, Anderson has suffered through major health issues. In 2019 Anderson was targeted in his neighborhood. As a result of this brutal attack during which he was shot four times, Anderson was hospitalized for two months at Kings County Hospital. At the hospital, he underwent surgery, where screws and a plate were inserted into his right knee and ankle. Anderson's injuries were so severe, physical therapists had to help him learn how to walk again. Anderson was well on his way to recovery when the COVID-19 pandemic shut down hospitals and curtailed his ability to get the services he desperately needed. Anderson continued to do what he could on his own in order to strengthen his body but without the proper medical support, he never recovered fully.

Anderson's poor physical condition worsened when he fell during his most recent encounter with police. As a result, he broke his femur and had to have a metal rod inserted into his leg. Anderson required crutches to move about, but once he was housed at MDC, he was allowed limited access to his crutches. Since MDC was experiencing frequent lockdowns and instability due to the COVID-19 pandemic, Anderson was not allowed to use his crutches except for when he was allowed outside of his cell and on the second day of his incarceration, he fell inside of his cell. Anderson was seen by the doctor at MDC, who recommended that Anderson be sent to the hospital as he was not deemed fit for confinement. Anderson spent six weeks at Kings County Hospital where again he participated in physical therapy before returning to MDC where his ability to properly heal was severely curtailed.

Finally, but critically, the COVID 19 pandemic tragically affected the inmates at MDC, including Anderson. As the Court is aware, MDC Brooklyn was the first Bureau of Prison's

detention facility to have a documented COVID case.[2] Like many other MDC prisoners, Anderson recounts inadequate medical attention and living under harsh conditions that have made his time in custody extremely challenging, particularly in light of his numerous medical conditions.[3] Historically, harsh conditions of confinement like these have played a role in a Court's determination of an appropriate sentence. The Second Circuit has held that "presentence confinement conditions may in appropriate cases be a permissible basis for downward departures." United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001). Recently, District Court judges in the Southern District of New York have granted variances in direct response to unsafe conditions at MDC.  As part of the §3553(a) factors in this case, the pandemic and its effect on Anderson must be considered.  In fact, this Court has considered the impact of COVID-19 in the prison and its effects as a 3553(a) factor. See e.g. United States v. Carlos Espinal, 19 Cr. 622 (DLC) (S.D.N.Y. August 6, 2020) (The Court imposed a sentence of 60 months [below 70-87 Guidelines range] in part because of the harsh conditions at MDC).  See also United States v. Unique Chavis, 19 Cr. 620 (DLC)(S.D.N.Y. August 14, 2020)  (The Court indicated the sole reason for imposing a sentence of 36 months [below 46-57 Guidelines range] was COVID and the harsh conditions of confinement at Valhalla). Other judges in this district have also considered the impact of COVID-19 in the prison and its effects as a 3553 (a) factor.  See e.g. United States v. Morgan, 19 Cr. 209 (RMB)(S.D.N.Y. May 5, 2020) (The Court imposed sentence of less than half stipulated guidelines range in part based on conditions at MDC and condemned conditions at both MCC and MDC even prior to pandemic); and United States v. Pierson, 14 Cr. 855 (LTS)(S.D.N.Y. May 4, 2020)(reducing the length of the sentence in part based on conditions at MDC).

During his incarceration, Anderson received few visits from his family.  The conditions at the prison and the lockdowns made it nearly impossible at times for him to even access the phone to speak with his loved ones.  The inability to maintain meaningful communication with his support system has been an extreme hardship for him.  Sadly, it is unclear when conditions will improve so that he can have the meager, humane privileges afforded prisoners such as visits and calls.  Prolonged incarceration under these circumstances also impedes his ability to engage in meaningful programming to advance the goals he has made for himself since his arrest.  Notwithstanding the significant barriers attendant to his incarceration at MDC, Anderson is committed to having a productive future.

Anderson recognizes the seriousness of his actions.  In conversations with Counsel, he acknowledged that his actions have had a ripple effect.  He fully comprehends how many people

---

[2] See Michael Balsamo, "1st fed inmate tests positive for coronavirus," Associated Press(March 21, 2020), available at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

[3] As part of a lawsuit against the MDC, correctional staff and detainees alike have described inadequate personal protective equipment, insufficient sanitation, little to no effort at contact tracing, and symptomatic detainees left Untested and Uncared For. See Chunn v. Edge, 20cv1590 (RPK), _F.Supp.3d_, 20 WL 3055669, *13-*14 (June 9, 2020 E.D.N.Y.).

were affected by his actions, particularly his mother who has been his one and only true supporter.

Accordingly, based upon the 3553(a) factors, including his personal history, the significant life changes he has experienced since his incarceration and the profound remorse he feels for the negative impact his actions have had on society and his family, Anderson respectfully requests the Court impose a sentence of 72 months, or a term far less than the 130-147 months of incarceration recommend by the Probation Department. Such a sentence does not deprecate the seriousness of the charges for which Anderson has been convicted, and, at the same time, meets the aims of justice.

The Supreme Court "has long recognized that sentencing judges 'exercise a wide discretion' in the types of evidence they may consider when imposing sentences." *Pepper v. U.S.*, 562 U.S. 476, 480 (2011). Indeed, 18 U.S.C. 3661 provides that "[n]o limitation shall be placed on the information" sentencing judges may consider "concerning the [defendant's] background, character, and conduct." In deciding whether to impose a sentence "within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information … unless otherwise prohibited by law." See Id; USSG 1B1.4 (Nov. 2010). With respect to the sentencing guidelines, the Supreme Court has long made clear that, while they are entitled to "respectful consideration," they are merely advisory and sentencing courts are not bound by any designated range. *U.S. v. Booker*, 543 U.S. 220 (2005).

As the Supreme Court recently explained in Lora v. United States, 599 U.S. 453 (2023), "[w]hen a federal court imposes multiple prison sentences, it can typically choose whether to run the sentences concurrently or consecutively." To the extent that Anderson's 924(c) conviction under Count Two is mandatorily concurrent, the undersigned would argue that such a rigid statutory mandate violates the Eighth Amendment's prohibition on cruel and unusual punishment by running afoul of the basic tenets of individualized sentencing.

## **Sentence Request and Conclusion**

Given Mr. Anderson's health, in addition to the other factors mentioned herein, a sentence of 130-147 months would be excessive. Neither the interests of justice nor the Constitution could countenance such a sentence for the charges in question. This Court should sentence Anderson to a term at which there is a reasonable expectation of release – one in which he could still make a meaningful contribution to society. Accordingly, the defense respectfully submits that a sentence of 72 months is sufficient, would adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment and deterrence.

Thank you.

Respectfully submitted,

/s/

Jodi Morales
*Attorney for Kevin Anderson*

cc: Assistant United States Attorney Emily Dean
USPO Meghan Wing