

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

EJD
F. #2021R00042

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 31, 2024

By ECF

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Kevin Anderson
                Criminal Docket No. 21-32 (MKB)

Dear Chief Judge Brodie:

      The government respectfully submits this letter in advance of the defendant Kevin Anderson's sentencing, scheduled for August 8, 2024, at 10:30 a.m. On March 16, 2023, the defendant pleaded guilty to all counts of the indictment ("the Indictment"), including possession with intent to distribute heroin, cocaine and fentanyl, in violation of 21 U.S.C. § 841(b)(1)(c), use of a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(1), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 130 to 147 months' imprisonment and five years of post-release supervision.

I.      Background

    A.        The Offense Conduct

      The defendant is a well-known drug dealer in the Bedford Stuyvesant neighborhood of Brooklyn, basing his operation out of a residential building located at 425 Gates Avenue. The charged offenses stem from the defendant's January 4, 2021 conduct when, at approximately 4:00 p.m., in the vicinity of Troy Avenue and Herkimer Street, NYPD officers observed a grey Jeep Cherokee (the "Jeep") run a red light. See Presentence Investigation Report ("PSR") ¶ 6. Officers followed the vehicle for another block at which

1

point the driver of the Jeep, later identified as the defendant, committed another traffic infraction. Id.  The officers, dressed in uniform, then pulled the Jeep over, exited their vehicle and approached the Jeep, at which point the defendant sped off. Id.  The officers ran back to the police vehicle and chased the defendant, who was driving erratically and hitting into other cars, for several blocks. Id.  The defendant only stopped when he was forced to, having crashed into another car. Id.  Even that did not stop the defendant – he jumped out of the Jeep and fled through the streets of Brooklyn on foot. Id.  Officers continued to chase the defendant and, after rounding a corner, found him lying on the sidewalk, as he had fallen after aggravating a pre-existing gunshot injury to his leg which he sustained the year before during an on-going feud with a rival drug trafficker, Demetrius Riggins.[1]  See id.

After he fell, the defendant, who was in possession of a fully-loaded .40 caliber semi-automatic pistol that was ejected from his person during his fall to the ground, pushed the firearm underneath a parked car just before police caught up to him.  See PSR ¶¶ 6, 8.  Officers recovered the firearm from underneath the parked car, loaded with 15 rounds of ammunition, and approximately 22 grams of crack cocaine from the defendant's coat pocket.  PSR ¶¶ 8, 9.  The defendant was taken to the hospital for his leg injury, where officers recovered an additional 27 grams of heroin and fentanyl from his clothing.  PSR ¶ 9.  Video surveillance obtained from a commercial establishment captured the defendant's flight, fall, and attempt to conceal the firearm under the parked car.  PSR ¶ 8.  The driver of one of the vehicles that the defendant struck during his flight from law enforcement was injured and taken to the hospital as a result of the defendant's conduct.  PSR ¶ 7.

B. The Firearm Possessed by the Defendant
   Was Used in a Homicide Five Days Earlier

On December 30, 2020, the defendant and Kelvin Ayers, who worked together trafficking narcotics, encountered rival Demetrius Riggins on Gates Avenue at approximately 10:56 a.m.  Riggins pulled out a gun and started shooting at the defendant and Ayers.  Ayers returned fire with a firearm he removed from his clothes (the "Ayers Firearm").  The defendant ran back to his vehicle and began circling around the block while Ayers followed Riggins on foot.  The defendant drove down Lexington Avenue, jumped out of his vehicle and shot Riggins to death with a second firearm outside of 286 Lexington Avenue.  The defendant then drove down the block, picked up Ayers and fled the area.  While the defendant contests his involvement in the homicide, and the government does not seek to prove the defendant's

---

[1] In the defendant's October 13, 2021 bail application, the defendant represented that he sustained his leg injury "when, as an innocent bystander, he was caught in a crossfire of bullets."  Def. Motion at 2, ECF No. 23.  As the defendant and this Court are aware, the government investigated the defendant for his role in the homicide of Demetrius Riggins.  The government's investigation indicated that Riggins' December 30, 2020 murder was the culmination of a drug turf war between Riggins and Anderson.  As part of the ongoing violence between Riggins and Anderson over drug turf, on September 2, 2019, Riggins shot Anderson multiple times while Anderson was sitting on a stool outside of 473 Gates Avenue.  Anderson's leg injury was the result of that incident.

commission of the murder at a <u>Fatico</u> hearing, the government provides this background as it relates to Count Three, the defendant's possession of a loaded firearm on January 4, 2021. As determined by a ballistics examiner with the NYPD's firearms analysis section, the firearm possessed by the defendant on January 4, 2021 when he fled law enforcement was the Ayers Firearm, fired by Ayers at Riggins only four minutes before Riggins was shot and killed on Lexington Ave.[2]

    C.    <u>The Defendant's History of Narcotics-Related Offenses</u>

As described in the PSR, the defendant's criminal history includes numerous prior convictions for narcotics-related offenses, including Criminal Possession of a Controlled Substance in the Third Degree, a Class B felony, Attempted Criminal Possession of a Controlled Substance in the Third Degree, a Class C felony, and two drug-related misdemeanor convictions. <u>See</u> PSR ¶¶ 43-47.

On June 7, 2011, the defendant was convicted of Attempted Criminal Possession of a Controlled Substance in the Third Degree, a Class C felony, in violation of New York State Penal Law ("N.Y.P.L.") § 220.16. PSR ¶ 43. This conviction resulted from the defendant's apprehension while in possession of 40 wax paper folds containing heroin and a quantity of cash. <u>Id.</u> The defendant was sentenced to four months' imprisonment and five years post-release supervision. <u>Id.</u> While on post-release supervision, the defendant was arrested and convicted of an additional narcotics-related felony.

On September 15, 2011, the defendant was convicted of two separate counts of Criminal Possession of a Controlled Substance in the Seventh Degree, a Class A misdemeanor, in violation of N.Y.P.L. § 220.03. PSR ¶¶ 44, 45. The first count related to the defendant's possession of 210 glassine envelopes of cocaine on October 19, 2010. PSR ¶ 44. The second count related to the defendant's sale of heroin to another individual on Gates Avenue on December 14, 2010. PSR ¶ 45. The defendant was not sentenced to a term of incarceration. <u>Id.</u>

On July 31, 2012, the defendant was convicted of Attempted Criminal Possession of a Controlled Substance in the Seventh Degree, a Class B misdemeanor, in violation of N.Y.P.L. § 220.03. PSR ¶ 47. The defendant was sentenced to 60 days' incarceration.

On January 30, 2013, the defendant was convicted of Criminal Possession of a Controlled Substance in the Third Degree, a Class C felony, in violation of N.Y.P.L. § 220.16. PSR ¶ 46. This conviction resulted from the execution of a search warrant at a residence where the defendant and four other individuals were found in possession of drug packaging materials, heroin, marijuana, a glass pipe and two drug ledgers. <u>Id.</u> Further, on the defendant's person

---

[2]     The government will provide the laboratory report documenting the microscopic comparison of ballistic evidence and conclusion of the examiner upon request of the Court. Ayers was subsequently murdered in a retaliatory shooting.

were additional bundles of heroin (37) and $2,250.02. The defendant committed this crime while on probation. The defendant was sentenced to 66 months' imprisonment and three years' post-release supervision.

Additionally, the defendant has pending charges in Kings County Supreme Court under indictment number 5490/2019 for Criminal Possession of a Controlled Substance in the Third Degree, a Class B felony (N.Y.P.L. § 220.16(1), possession of a narcotic drug with intent to sell), and related crimes. See PSR ¶ 51. This Kings County case stems from an incident on July 5, 2019, where law enforcement responded to a "gun stop" tip of a male named "Kevin" in possession of firearms in the lobby of 425 Gates Avenue. When law enforcement officers arrived at the location, they observed the defendant, Kevin Anderson, fitting the description provided by the tip, in the lobby of the location. The defendant fled into the basement and then out a window. During his flight, the defendant secreted bags containing approximately 269 vials of crack cocaine in a loose cinderblock on the ground outside. PSR ¶ 51. Officers recovered not only the crack cocaine, but, also, video surveillance that recorded the defendant hiding the crack cocaine in the cinderblock while running from the police. See id. Officers recovered additional vials of crack cocaine and glassines of heroin from the top of a washer machine along with the defendant's wallet and three cell phones, discarded in his haste to escape the police. See id. Officers further recovered additional crack cocaine as well as three firearms from the basement through which the defendant fled.[3] See id. In total, the defendant possessed over 100 grams of cocaine on that day as well as .049 grams of heroin, the vast majority of which was packaged for sale.

II.   Guidelines Calculation and Statutory Framework

The parties agree with Probation's calculation of the Guidelines Offense Level as 23. PSR ¶¶ 16-41. The minimum term of imprisonment for Count Two is five years, which must be imposed consecutively to any other counts. PSR ¶ 103; 18 U.S.C. § 924(c)(1)(A)(1). The defendant is in Criminal History Category IV. PSR ¶¶ 48-49. Based on a total offense level of 23 and a Criminal History Category of IV, the Guidelines imprisonment range is 70 to 87 months. PSR ¶ 104. Because Count Two requires a five-year term of imprisonment consecutive to any other counts, the total effective Guidelines range is 130 months to 147 months. Id.

III.   Applicable Law

Although courts must first consider the Guidelines—the "starting point" of sentencing, Gall v. United States, 552 U.S. 38, 49 (2007)—they must then turn to "all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Critically, the Court "may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50.

---

[3]   The defendant was not charged with possessing the firearms.

4

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

Title 18, Section 3661 directs the Court to consider all relevant conduct and information about the defendant when sentencing him: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." As a result, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).

IV.     Analysis

   A.     Section 3553(a) Factors Weigh in Favor of the Requested Sentence

The government respectfully requests that the Court impose a Guidelines sentence of 130-147 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to reflect the defendant's offense and the defendant's criminal history, to deter this defendant and others from committing similar crimes in the future, to protect the public from the defendant and to achieve all the other purposes of sentencing.

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." Kimbrough v. United States, 552 U.S. 85, 109 (2007) (citation and internal quotation marks omitted); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed to be reasonable because "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 358 (2007). "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." Id. at 350. Furthermore, Guidelines sentences promote Congress' goal in enacting the Sentencing Reform Act: "to diminish unwarranted sentencing disparity." Id. at 354.

Here, the nature and circumstances of the offense are extremely serious. In the commission of the instant offenses, the defendant jeopardized the safety of the community in multiple ways. First, he was selling dangerous narcotics, including cocaine, heroin and fentanyl. Second, the defendant was arrested in possession of a loaded firearm – the very firearm that Ayers used in a shootout on a public street, Gates Avenue, in the middle of a

weekday morning, just five days earlier. Third, when law enforcement attempted to pull him over, instead of complying with orders, he led the police on a chase, ran red lights and stop signs, struck parked vehicles, caused a car crash involving two occupied vehicles and another driver. Even this did not stop the defendant, as he then fled the scene of the accident that he caused, ran from the police and stopped only because his leg gave out on him.[4] The defendant then made a last-ditch effort to hide his firearm from the police by pushing it under a car. The defendant's dangerous and reckless actions could have easily resulted in severe injury or death of the numerous motorists and pedestrians on the streets in the middle of the afternoon.

       The defendant's history and characteristics, as well as the need for specific deterrence, also support the government's recommended Guidelines sentence of 130-147 months' imprisonment. The defendant is in Criminal History Category IV, having previously been convicted of numerous drug-related crimes. In fashioning an appropriate sentence, the Court should consider the evidence outlined above that the defendant is a heroin, fentanyl and crack dealer who also carries firearms. It is clear that punishments imposed in the past, have had no deterrent effect on the defendant's criminal behavior, and a significant punishment is warranted to deter the defendant from engaging in this conduct again. A more serious sentence is therefore warranted to deter the defendant from continuing to commit the same crimes. See 18 U.S.C. § 3553(a)(2)(B); United States v. Fairclough, 439 F.3d 76, 80 (2d Cir. 2006) ("[The defendant's] repeated convictions and lenient treatment by state courts support the District Court's finding that he was prone to recidivism.").

       Court supervision has had no effect on the defendant. The defendant has repeatedly committed new offenses while on probation or while charges were pending against him. See PSR ¶¶ 43, 46, 47, 51. Indeed, the defendant's felony narcotics case was pending in Kings County when he committed the instant federal offenses in January 2021. Facing state charges for narcotics trafficking did not deter the defendant from continuing to sell heroin, fentanyl and crack cocaine within the Brooklyn community, nor did it deter him from obtaining and carrying a loaded firearm.

       Finally, the requested sentence is necessary to afford adequate deterrence to this type of criminal conduct, including the distribution of fentanyl which is devastating communities and taking lives both locally and nationwide, and to protect the public from further crimes perpetrated by this defendant. 18 U.S.C. § 3553(a)(2)(B) and (C).

---

[4] Anderson characterizes this injury in his sentencing memo as resulting from a "[fall] during his most recent encounter with police." Def. Mem. at 3. Anderson's flight on foot from the police is captured on video—at the time he falls, no police officer has yet caught up to him. Indeed, this old leg injury that he re-aggravated during his flight from the police is entirely the result of his decision to lead police on a dangerous chase during which the defendant injured another person and himself.

B.     The Defendant's Request for a Downward Departure Should Be Denied

The defendant requests that the Court downwardly depart and sentence the defendant to a term of 72 months' incarceration. As the defendant faces a mandatory minimum sentence of 60 months on Count Two of the Indictment, unlawful use of firearms in furtherance of a drug trafficking crime, the defendant's proposed sentence is barely above the mandatory minimum sentence in this case and 58-75 months below the applicable Guidelines range. A sentence of 72 months' incarceration is only 6 months greater than the sentence given to the defendant in 2013 after he pleaded guilty to Criminal Possession of a Controlled Substance in the Third Degree for possessing heroin with the intent to sell it. Such a sentence did nothing to deter the defendant's criminal conduct—indeed, he continued the same criminal activity and escalated to selling fentanyl and carrying firearms. To suggest that such a similar sentence is appropriate in this case disregards the sentencing factors that the Court must consider.

The defendant does not address the nature and circumstances of the crime, his history and characteristics as they relate to his pervasive drug trafficking and possession throughout the years, the danger he poses to the community or why a sentence of only 72 months would deter him from future criminal activity where a nearly identical sentence for a similar but less serious crime did nothing to deter him in the past. Instead, the defendant asks the Court to depart significantly from the Guidelines based on the defendant's difficult upbringing, his medical condition and his incarceration at the Metropolitan Detention Center ("MDC") during the Covid-19 pandemic when conditions within the prison were particularly challenging. See PSR ¶¶ 2-5. The government acknowledges that the Court may take into account conditions at MDC during the time period of the defendant's incarceration as part of its analysis of the 18 U.S.C. § 3553(a) factors. Should the Court find that the conditions at MDC during the defendant's incarceration are a factor in its sentencing decision, the government submits that it is still appropriate, in light of the totality of the sentencing factors in this case, for the Court to sentence the defendant within the applicable Guidelines, which has a 17 month range from its low to high end.

The defendant's reliance on his upbringing in asking the Court for a significant downward departure is misplaced. Most notably, the defendant describes the effect that the crack epidemic had on his family structure and his life. However, the defendant, a well-known drug-dealer in the Bedford-Stuyvesant neighborhood of Brooklyn, has chosen to become the cause of the same community devastation by dealing dangerous drugs, including crack, heroin and fentanyl to mothers, fathers, sisters, brothers and children throughout Brooklyn. Many New Yorkers of the defendant's age group lived through the crack epidemic—most did not choose to victimize their own community by way of the same conduct.

Finally, the defendant requests a sentence of 72 months' incarceration as a result of his various medical conditions, including asthma and his leg injury. The defendant repeatedly moved for bond and for reconsideration of the Court's denial of his motion for bond in this matter. See Dkt. Nos. 8, 23, 28. In the defendant's second motion for bond and

7

his motion for reconsideration of the Court's denial of bond, the defendant relied heavily on his medical condition as a reason the Court should grant bond. See Dkt. Nos. 23, 28. In response, the government provided the Court with detailed information about MDC's continuous and timely responses to the defendant's medical requests and the defendant's repeated misrepresentations to the Court about his medical condition and treatment. See Dkt. Nos. 24, 29. In short, the defendant's asthma was attended to from the beginning of his stay at MDC and there were no medical records to suggest that it had worsened or been ignored. See Dkt. No. 24, Gov. Mem. in Opp.at 9. Further, the defendant's leg injury—a result of being shot by a rival drug dealer and made worse by his fall while running from police in this case—was also treated consistently throughout his time at MDC. See Dkt No. 24, Gov. Mem. in Opp. at 10. Notably, by August of 2021, the defendant reported a workout regime to the medical unit, which included 100 pushups a day, 75-100 dips a day and 50 burpees a day, an exercise which includes a squat thrust and a jump between repetitions. Id. The defendant's medical condition, as articulated in his sentencing memorandum, does not justify a sentence of 72 months in this matter.

V.  Conclusion

For the foregoing reasons, the government respectfully submits that the Court sentence the defendant to a Guidelines sentence between 130 months and 147 months in prison.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
Emily J. Dean
Assistant U.S. Attorney
(718) 254-6120

cc:   Clerk of Court (MKB) (by ECF)
      Jodi Morales, Esq. (by ECF and email)

8